Jeffrey L. Tarkenton (VSB No. 20631)
Cathy A. Hinger (VSB No. 46293)
Pascal F. Naples (VSB No. 87849)
Womble Carlyle Sandridge & Rice, LLP
1200 Nineteenth Street, N.W.
Suite 500
Washington, DC  20036
(202) 857-4450 – Telephone
(202) 261-0050 – Facsimile

*Counsel for Plaintiff Raymond A. Yancey*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | | |
|---|---|---|
| In Re: | : | |
| | : | |
| **MIN SIK KANG** | : | **Case No. 10-18839-BFK** |
| **MAN SUN KANG** | : | **Chapter 11** |
| | : | |
| **Debtors.** | : | |
| | : | |
| **RAYMOND A. YANCEY, CHAPTER 11** | : | |
| **TRUSTEE for bankruptcy estates of Min** | : | |
| **Sik Kang and Man Sun Kang,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Adv. Pro. No. 16-1005-BFK** |
| | : | |
| **MIN SIK KANG,** | : | |
| **9378 Colbert Court** | : | |
| **Fairfax, Virginia  22032** | : | |
| | : | |
| **MAN SUNG KANG,** | : | |
| **9378 Colbert Court** | : | |
| **Fairfax, Virginia  22032** | : | |
| | : | |
| **BOP SIK KANG** | : | |
| **7310 Glendower Court** | : | |
| **Springfield, Virginia  22153** | : | |
| | : | |
| **YOUNG NAM KANG** | : | |
| **9378 Colbert Court** | : | |
| **Fairfax, Virginia 22032** | : | |

|  |  |
|---|---|
| **SUE KANG KIM** | : |
| **1625 International Drive** | : |
| **Unit 413** | : |
| **McLean, Virginia  22102** | : |
|  | : |
| **STEVE KIM** | : |
| **1625 International Drive** | : |
| **Unit 413** | : |
| **McLean, Virginia  22102** | : |
|  | : |
| **YONG JIN JUNG** | : |
| **a/k/a YOUNG JIN JUNG** | : |
| **3213 Saber Circle** | : |
| **Fairfax, Virginia  22030** | : |
|  | : |
| **Defendants.** | : |
|  | : |

## AMENDED COMPLAINT OBJECTING TO DISCHARGE AND FOR OTHER RELIEF

Plaintiff Raymond A. Yancey, the Chapter 11 Trustee (the "Plaintiff") appointed in the bankruptcy case of Min Sik Kang ("Mr. Kang") and Man Sun Kang ("Mrs. Kang") (collectively, the "Kangs"), by and through his undersigned counsel and pursuant to 11 U.S.C. §§ 105(a), 521(a)(4), 541(a), 542(a), 727(a) and 1115(a)(1), 18 U.S.C. § 1962, Virginia Code § 18.2-500, and Bankruptcy Rule 7001, herewith files this complaint (the "Complaint") (a) for damages and declaratory relief, and attorneys' fees against the Kangs and various family members and co-conspirators to recover funds, assets and property that they have fraudulently generated and concealed from the Kangs' respective bankruptcy estates (the "Kangs' Estates"); (b) to deny the Kangs discharges in bankruptcy; and (c) to declare that personal property seized from the Kangs by the Federal Bureau of Investigation ("FBI") constitutes property of the Kangs' Estates and to compel the Kangs to turn over the seized property and to direct the FBI to deliver the seized property to the Plaintiff.  In support of the relief requested herein, the Plaintiff alleges as follows:

## **NATURE OF THE CASE**

1.      This action arises from post-petition schemes and actions the Kangs orchestrated to generate revenue that they have concealed from Plaintiff and the Bankruptcy Court, the Kangs' failure to disclose both pre-petition and post-petition assets, and the Kangs' concealment of post-petition revenue.  After filing their petitions declaring bankruptcy, the Kangs continued to operate their businesses located in the Republic of Korea, without disclosure to or oversight by the Court or the Plaintiff, and they fraudulently established and operated a series of food distribution and grocery store companies and related businesses in the United States.  The Kangs enlisted family members and business associates who knowingly conspired with them to serve as nominal owners, officers and managers of these businesses, when in reality the businesses were conceived of, established, organized, dominated and run by the Kangs.  The co-conspirators facilitated unreported cash payments and other monetary benefits to the Kangs.  The Kangs failed to disclose their receipt of these payments to Plaintiff and fraudulently omitted their receipt of these payments from their Monthly Operating Reports ("MORs").  The Kangs engaged in these schemes with the intent to hide assets that belong to the Kangs' Estates, and deceived Plaintiff, this Court and their creditors.  Details of many of these schemes were recently revealed through public filings made in a criminal case filed against Mr. Kang in the United States District Court for the Eastern District of Virginia ("District Court"), Case Number 15-cr-00025-GBL (the "Criminal Case").

2.      The Kangs' actions have harmed the Kangs' Estates and imposed further injury on the creditors.  Mr. Kang has admitted that some of his actions violated criminal laws and the rules and statutes that govern these bankruptcy proceedings.  By this adversary proceeding, Plaintiff intends to expose the full extent of the Kangs' fraud, disgorge them and their co-

conspirators of any and all assets they have fraudulently received and obscured, recover the Seized Assets, and deny the Kangs a discharge of their debts.

## JURISDICTION AND VENUE

3.      This adversary proceeding is brought pursuant to 11 U.S.C. §§ 105(a), 521(a)(4), 541(a), 542(a), 727(a) and 1115(a)(1), 18 U.S.C. § 1962, Virginia Code § 18.2-500 and Bankruptcy Rule 7001(1).

4.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.

5.      This is a core proceeding pursuant to 28 U.S.C. § 157.

6.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

7.      Plaintiff Raymond A. Yancey is the Chapter 11 Trustee appointed by the United States Trustee to serve as Chapter 11 trustee in this Bankruptcy Case.

8.      Defendant Min Sik Kang ("Mr. Kang") is a resident of the Commonwealth of Virginia and one of the debtors in the above-captioned bankruptcy matter.

9.      Defendant Man Sung Kang ("Mrs. Kang") is a resident of the Commonwealth of Virginia and one of the debtors in the above-captioned bankruptcy matter.  Mrs. Kang is the wife of Mr. Kang.

10.      Defendant Bop Sik Kang a/k/a Bub Sik Kang a/k/a Bob Sik Kang is a resident of Gwangju, South Korea and maintains a residence in Annandale, Virginia.  He is Mr. Kang's brother.

11.      Defendant Young Nam Kang is a resident of the Commonwealth of Virginia and a daughter of the Kangs.

12.     Defendant Sue Kang Kim is a resident of the Commonwealth of Virginia and a daughter of the Kangs.  She is married to Steve Kim.  Throughout the Bankruptcy Proceedings, Sue Kang Kim has been in active communication with the Kangs' various counsel and assisted in financing the Kangs' legal teams, with contributions totaling over $200,000.

13.     Defendant Steve Kim is a resident of the Commonwealth of Virginia.  He is the husband of Sue Kang Kim and a son-in-law of the Kangs.

14.     Defendant Yong Jin Jung a/k/a Young Jin Jung ("YJJ") is a resident of the Commonwealth of Virginia and a business associate of the Kangs.

## STATEMENT OF FACTS

### Appointment of Plaintiff and His Investigation

15.     On October 19, 2010 (the "Petition Date"), the Kangs filed a voluntary petition under Chapter 11 of the Bankruptcy Code, Case No. 10-18839-RGM (the "Bankruptcy Case"), in the United States Bankruptcy Court for the Eastern District of Virginia (the "Court").

16.     On January 7, 2013, the Court entered the Order Granting Motion for Appointment of Chapter 11 Trustee.

17.     On January 7, 2013, the United States Trustee filed the Amended Appointment of Raymond A. Yancey as Chapter 11 Trustee by the United States Trustee, appointing the Plaintiff to serve as Chapter 11 Trustee in the Bankruptcy Case.

18.     On January 16, 2013, the United States Trustee filed a motion seeking court approval of the appointment of Raymond A. Yancey as Chapter 11 Trustee.  The Court entered an order granting that motion on January 17, 2013.

19.     Since his appointment, Plaintiff has diligently investigated the Kangs' assets and interests in various companies and enterprises.  Plaintiff's investigation, together with new facts

learned as a result of the Criminal Case, have revealed that the Kangs have been engaged in numerous post-petition businesses, schemes, enterprises and conspiracies to defraud Plaintiff, the creditors and this Court.

### Undisclosed Revenue from Korean Properties and Undisclosed Korean Bank Accounts

20.    Mr. Kang and Mrs. Kang owned, at the commencement of this bankruptcy case, commercial and residential real property as well as farm and forest land located in the Republic of Korea.

21.    Mr. Kang's brother, defendant Bop Sik Kang, who is employed in Korea but who resides with his wife and children in Annandale, Virginia, for parts of the year, has operated and managed the Korean properties that Mr. Kang owns. Bop Sik Kang collected rents, which constitute Estate property, paid obligations, handled repairs and handled litigation for Mr. Kang's properties.

22.    Despite repeated requests, the Kangs have failed, with limited exceptions, to deliver to Plaintiff the documents that Plaintiff has asked them to provide to him regarding the Korean properties.

23.    Plaintiff has commenced an ancillary bankruptcy proceeding for the Kangs in the Republic of Korea.

24.    Plaintiff identified rents and insurance proceeds collected since the commencement of the Bankruptcy Case from two of Mr. Kang's commercial properties in Korea, which total US $471,169, consisting of rents paid on account of the Paradise Hotel in the amount of 234,999,983 won (approximately US $234,999), insurance payments paid on account of the Paradise Hotel in the amount of 143,570,112 won (approximately US $143,570), and rents

paid on account of the Top Motel in the amount of at least 92,600,002 won (approximately US $92,600).

25.    Mr. Kang is the owner of a Gwangju Bank account ("Mr. Kang's Gwangju Account") which Bob Sik Kang has rights to control and manages for Mr. Kang.  Mr. Kang received rental income from his properties that was deposited into Mr. Kang's Gwangju Account, which he and Bob Sik Kang also used to pay various expenses.

26.    Mrs. Kang is also the owner of a Gwangju Bank account in Korea ("Mrs. Kang's Gwangju Account").  During the Bankruptcy Case, deposits were made into Mrs. Kang's Gwangju Account from unknown sources.

27.    Until March 19, 2015, the Kangs had not disclosed their Gwangju Accounts or any of the rental income from their Korean properties in the Bankruptcy Case.  Mr. Kang disclosed certain rental income only after the Plaintiff, through his investigation in Korea, identified the existence of the Gwangju Accounts.  Mrs. Kang has never disclosed her Gwangju Account or whether she has received income from her properties in Korea.  The Kangs did not disclose existence of the Gwangju Accounts in their bankruptcy schedules or in the MORs that they filed with the Bankruptcy Court.

28.    To date, none of the rental or other income from the Korean properties has been turned over to Plaintiff.

29.    The bank statement for Mr. Kang's Gwangju Account, into which some portion of the rent from the Paradise Hotel was deposited, shows deposits of approximately US $471,169 (which sum includes the insurance payment) during the Bankruptcy Case, of which only about US $1,000 remained as of November 5, 2014.

30.     The Kangs continued to operate their Korean properties during the Bankruptcy Case, including making payments on loans, leasing real property, and pledging assets.  The Kangs failed to disclose – or to obtain Court approval for – these actions, and they failed to disclose these transactions in the MORs that they filed or in the information they provided to the Plaintiff after his appointment as the Chapter 11 Trustee.

31.     During the Bankruptcy Case, both Mr. and Mrs. Kang received payments for the sale of lumber on forest land they own in Korea, and which they failed to report on their MORs, and which they failed to disclose to Plaintiff.

32.     The rent and insurance payments derived from Mr. Kang's Korean properties constitute property of Mr. Kang's bankruptcy estate, and Mr. Kang's estate and his creditors were harmed in the amount of at least US $471,169 by Mr. Kang's failure to deliver the rent and insurance payments to Plaintiff.

33.     Payment derived from Mrs. Kang's Korean properties constitute property of Mrs. Kang's bankruptcy estate, and Mrs. Kang's estate and her creditors were harmed in an unknown amount by her failure to deliver the funds to the Plaintiff.

**The Kangs Replaced Their MS Grand and Grand Mart Grocery Businesses With Five Days Market and the G-Marts During Bankruptcy**

34.     Throughout the 2000s, the Kangs owned and operated MS Grand, Inc. ("MS Grand"), a Maryland food product wholesaler, as well as a series of "Grand Mart" grocery stores in Virginia and Maryland.

35.     Between 2007 and 2009, the Kangs attempted to expand their grocery business to the area surrounding Chicago, Illinois.  The attempted expansion failed and left the Kangs with enormous debts to banks, other food distributors, and landlords.

8

36.     In 2009, Mrs. Kang approached YJJ, a Grand Mart store manager and employee, and told him that MS Grand could no longer purchase supplies, so the Kangs wanted to open a new food distribution company in YJJ's name.  YJJ was financially dependent on Mr. Kang for his employment and did not feel that he could say no, so he acquiesced in Mrs. Kang's request.

37.     On November 24, 2009, the Kangs and Steve Kim caused Five Days Market, Inc. ("Five Days") to be incorporated in the Commonwealth of Virginia.  According to corporate records produced by Steve Kim, YJJ was the 100% owner and registered agent of Five Days. The registered agent address was YJJ's home address.

38.     The Kangs put the new business in YJJ's name because they recognized that they would soon be facing bankruptcy and MS Grand either lost or was about to lose its Perishable Agricultural Commodities Act ("PACA") license.

39.     The Kangs caused the Grand Marts to commence purchasing food products from Five Days and the Kangs caused the Grand Marts to advance Five Days funds with which to purchase food product supplies.  Mrs. Kang supervised all of the accounting and bookkeeping staff for the Grand Marts and Mr. Kang was the President.  As such, they both knew Grand Mart funds were being used to capitalize Five Days and start up this new business.  YJJ contributed no capital to Five Days and had no money to start up a new business.  The Kangs funded the start up costs for Five Days.

40.     Upon information and belief, the Kangs also capitalized Five Days by coaxing a California food product supplier to ship supplies to Five Days in Maryland, but prepared an invoice to a California Grand Mart grocery store, which made it appear that the product was being delivered to the Kangs' California store.  The Kangs used the phony invoices to trick the California landlord into believing a product inventory allowance provided by the California

landlord was being used to supply the California store, when, in reality, the Kangs were using the California product inventory allowance to purchase supplies that were shipped to Five Days, which in turn supplied the Maryland and Virginia Grand Marts.

41.    Mr. Kang also recruited a former MS Grand employee, Han Cho, to join Five Days.  At Mr. Kang's direction, Mr. Cho prepared a presentation reflecting the evolution of the MS Grand/Grand Mart businesses into the Five Days/G-Mart businesses.  Mr. Kang instructed Mr. Cho to include false and inflated financial information and projections into materials Mr. Kang provided to prospective investors and landlords in order to obtain leases for G-Mart stores, tenant allowances and investments.

42.    In 2010, MS Grand was stripped of its PACA license.  On October 19, 2010, MS Grand filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland, which was subsequently transferred to this Court. Mr. Kang formed Five Days and various G-Mart entities with the plan and intent of operating substantially the same business through a new web of companies which he used to hide income he generated from those companies from the Kangs' Estates.

43.    Five Days registered to do business in Maryland in or about 2011.  Upon information and belief, Mr. Kang and Steve Kim caused Five Days to register to do business in Maryland.  Five Days' Maryland resident agent was Tae Kim at 11464 Stoney Point Place, Germantown, Maryland  20876.  This was a residential townhouse.

44.    On December 17, 2010, Five Days entered into a sublease agreement (the "Sublease Agreement") with Potomac Wholesale, Inc., by which Five Days subleased from Potomac Wholesale, Inc. real property located at 7825 Rappahanock Avenue, #A, Jessup,

Maryland  20794 (the "Warehouse") for storage and distribution of food products to supply the G-Mart grocery stores.

45.     Mr. Kang executed the Sublease Agreement as the President of Potomac Wholesale, Inc. ("Potomac Wholesale").  Mr. and Mrs. Kang were each 50% owners of Potomac Wholesale.  Upon information and belief, Mrs. Kang managed the finances and administrative matters for Potomac Wholesale, for example, receiving Potomac Wholesale financial statements and tax documents from their accountant and managing certain state filings for the entity. Potomac Wholesale had no other business operations other than leasing the space used by Five Days from the building owner, and subleasing the space to Five Days.  The Kangs have never, either in their schedules or in filings with this Court, identified their interest in Potomac Wholesale.

46.     The Sublease Agreement identified the President of Five Days as Ricky Cho, another former Grand Mart employee who worked for Mr. Kang.

47.     On April 29, 2014, Five Days' Maryland registered agent was changed to "Yong" Jung, 7825 Rappahanock Avenue, #A, Jessup, Maryland  20794, who, upon information and belief, is YJJ.

48.     In October 2010, Five Days obtained a PACA license and commenced operating a distributor business that was substantially identical to MS Grand's operations.  Mr. Kang recruited many of the same employees who worked for MS Grand or the Grand Marts to work at Five Days or the G-Marts.

49.     Mr. Kang designated defendant YJJ as President of Five Days because Mr. Kang wanted to conceal his interests in this company from the Kangs' Estates, the Court and his creditors.

11

50.     YJJ, the nominal President, did not initially have anything to do with Five Days. Rather, YJJ continued to work at Mr. Kang's Grand Mart store in Annandale, Virginia.  YJJ knew about Mr. Kang's use of him as a nominal front for Five Days and acquiesced in the scheme.  Eventually, though, Mr. Kang told YJJ that it looked suspicious that YJJ was not working at Five Days, so Mr. Kang instructed YJJ to report to the Five Days warehouse in Maryland, and YJJ then ceased working for Grand Mart.  YJJ had very little responsibility at the Five Days warehouse.  Mr. Kang set YJJ's salary and continued to pay him the same wage he was paid when working at Grand Mart.

51.     Mr. Kang appointed his son-in-law, defendant Steve Kim, to run Five Days' operations at the Warehouse.  However, Mr. Kang functioned as Steve Kim's boss and was frequently present at the Warehouse acting as the owner or manager in charge of the site.

52.     Five Days reported over $36,000,000 in sales.

53.     Upon information and belief, Steve Kim received hundreds of thousands of dollars of payments from Five Days and other food distribution businesses he started.  Steve Kim facilitated the transfer of funds or cash derived from the Five Days or G-Mart businesses to Mr. Kang with the intent of concealing the Kangs' receipt of funds derived from Five Days from Plaintiff.

54.     Five Days issued wage payments to the Kangs' daughter Young Nam Kang, from 2010 – 2013, of at least $132,000.  Young Nam Kang never worked for Five Days.  Young Nam Kang received these funds with the intent of concealing the Kangs' generation of revenue through Five Days from Plaintiff and the Bankruptcy Court.

55.     Starting in or about 2010, another entity by the name Five Days Wholesale, Inc. purported to do business out of the Warehouse and 8899 Woodyard Road, Clinton, Maryland

20735, which was also the location of G-Mart Clinton, Inc.  Upon information and belief, YJJ

was an officer or manager of Five Days Wholesale, Inc.  As with Five Days, YJJ's leadership

role was nominal and the company was actually conceived of, formed, operated and run by Mr.

Kang.

56.     After Mr. Kang caused Five Days to be formed, he caused numerous international

grocery store businesses to be separately incorporated operating under the name "G-Mart."  Mr.

Kang commenced operations of the G-Mart stores with the help of YJJ and other MS Grand

employees and again listed YJJ as the owner or registered agent of numerous G-Mart entities.

57.     At Mr. Kang's direction, Steve Kim was primarily responsible for forming the G-

Mart companies because he is a graduate of George Mason University, was educated in the

United States and is fluent in English.  Mr. Kang's English, however, is very broken and he is

not fluent in English.  Therefore, he relied on Steve Kim to handle all matters related to the

formation of companies, registrations, dealings with state entities or any other matter requiring

interactions with English speaking third parties.

58.     Among the activities Steve Kim engaged in were communications with Wells

Fargo Bank and/or the Small Business administration concerning a loan that he caused to be

applied for in YJJ's name to fund the acquisition of a commercial property in which they planned

to operate a G-Mart in Virginia Beach.  Upon information and belief, because the documents

were among Steve Kim's business records, Steve Kim prepared a fraudulent SBA form Personal

Financial Statement to submit to the SBA and/or Wells Fargo bank.  The Personal Financial

Statement listed false and grossly inflated assets allegedly owned by YJJ to induce the Wells

Fargo Bank and/or the SBA to approve funding for a loan to purchase the building.  For

example, the Personal Financial Statement falsely asserted that YJJ had $250,000 in cash on

hand or in the bank and $13,900,000 in stocks and bonds, even though he never had such assets. There is a signature of YJJ on the document, but he did not sign it or authorize anyone to sign it for him.  It was forged, upon information and belief, using the YJJ signature stamp.  To the extent this statement, or other similar information was mailed or otherwise sent to the SBA and/or Wells Fargo Bank, such conduct would violate, among other laws, 18 U.S.C. § 1014.

59.    Numerous G-Mart entities shared the same business addresses and registered agents with Five Days and other G-Mart companies as illustrated by the following table:

| Entity | Registered Agent(s) | Registered Agent Address | Business Address | Other Information |
|---|---|---|---|---|
| G-Mart Alexandria, Inc. | YJJ (11/19/12 – 10/23/13)<br><br>Han Cho (11/19/12 – 1/22/13) | 3213 Saber Circle, Fairfax, VA 22030<br><br>8750 Richmond Highway, Alexandria, VA 22309 | | Secretary was Han Cho |
| | Steve Kim (11/19/12) | 1625 International Drive, Unit 413, McLean VA 22102 | | |
| G-Mart Baltimore, Inc. | Steve Kim | | 7825 Rappahanock Avenue, #A, Jessup, MD 20794<br><br>East Lombard Street, Baltimore, MD  21224 | Formed by YJJ per Articles of Incorporation |

| Entity | Registered Agent(s) | Registered Agent Address | Business Address | Other Information |
|---|---|---|---|---|
| G-Mart Clinton, Inc. | Steve Kim | | 8899 Woodyard Road, Clinton, MD 20735<br><br>7825 Rappahanock Avenue, #A, Jessup, MD 20794 | Formed by YJJ per Articles of Incorporation |
| G-Mart Fairfax, Inc. | YJJ | 3213 Saber Circle, Fairfax, VA 22030 | 13065 Fair Lakes Shopping Center, Fairfax, VA 22033 | |
| G-Mart Frederick, Inc. | Steve Kim<br><br><br>Kye Seungbum (1/12/15 – 8/24/15) | <br><br><br>9639 Lost Knife Road, Gaithersburg, MD 20877 | 7825 Rappahanock Avenue, #A, Jessup, MD 20794<br><br>1063 West Patrick Street, Frederick, MD 21702 | Formed by YJJ per Articles of Incorporation |
| G-Mart Hillcrest Heights, Inc. | Steve Kim | | 7825 Rappahanock Avenue, #A, Jessup, MD 20794 | Formed by YJJ per Articles of Incorporation |
| G-Mart Holdings, LLC | Soon Kwon (4/5/14-8/24/15) | Suite 307, 100 Parkway, Columbia, MD 21045 | 7825 Rappahanock Avenue, #A, Jessup, MD 20794 | Formed by Han Cho |
| G-Mart International | | | 8899 Woodyard Road, Clinton, MD 20735 | Primary owner listed as YJJ |

| Entity | Registered Agent(s) | Registered Agent Address | Business Address | Other Information |
|---|---|---|---|---|
| G-Mart Kissimmee, Inc. | Han Cho | 4081 West Vine Street, Kissimmee, FL  34741 | 7825 Rappahanock Avenue, #A, Jessup, MD 20794 | President is listed as "Jung Yong" but upon information and belief is YJJ |
| G-Mart Montgomery, Inc. | Han Cho | 2747 Bell Road, Montgomery, AL 36117 | 2747 Bell Road, Montgomery, AL 36117 | |
| G-Mart Virginia Beach, Inc. | Han Cho and Steve Kim | 1505 Lynnhaven Parkway, Virginia Beach, VA  23453 | 1505 Lynnhaven Parkway, Virginia Beach, VA  23453 | Secretary was Han Cho |
| Fiesta International Market 2, Inc. t/a G Mart International Foods | Han Cho | 3307 Buford Highway, Atlanta, GA  30329 | 7825 Rappahanock Avenue, #A, Jessup, MD 20794 | |

60.    Again, YJJ was designated as the President, CEO and owner of many of the G-Mart companies.   However, Mr. Kang was in control of the G-Mart enterprise and was considered the boss.

61.    Steve Kim assisted Mr. Kang with his formation and registration of several G-Mart entities by serving as a registered agent as set forth above.

62.    In or about November 2011, at Mr. Kang's direction, Steve Kim caused a company called Ruby Transportation, Inc. ("Ruby") to be formed, listing Kwang Soo So, Mr. Kang's cousin, as the owner.   Ruby was an entity that owned trucks and shipped product between Five Days and various G-Mart stores.  Upon information and belief, Ruby was another entity from which the Kangs or their family received payments without detection by Plaintiff or the Bankruptcy Court.   For example, Ruby issued checks for $1,000 per week to Mr. Kang's

cousin Yong Soo So, Kwang Soo So's brother, for at least six months, even though he was not employed by Ruby.

63.     Even before the Petition Date, the Kangs enlisted family members to disguise their operation and funding of businesses.  Moreover, the Kangs used the disguised ownership to funnel funds to non-debtor entities.

    a.   On August 5, 2009, Sully Station Supermarket, Inc. ("Sully Station"), a grocery store located in Centreville, Virginia, was incorporated in Virginia.  Sue Kang Kim and Young Nam Kang were the nominal owners and officers of Sully Station, but the Kangs owned, operated, and controlled Sully Station.  The Kangs never reported their interest in Sully Station on their bankruptcy schedules.

    b.   Maplewood Supermarket Inc. ("Maplewood"), which was also knowns as Sky Mart Manassas, operated a supermarket located at 8238 Shopper's Square, Manassas, Virginia.  Although the Kangs asserted that Maplewood was owned in equal parts by their daughters Sue Kang Kim and Young Nam Kang, the Kangs effectively operated and controlled Maplewood.  Furthermore, the Kangs were co-debtors on Maplewood's lease and scheduled a claim in favor of the landlord in the amount of $17,789,419.

    c.   Following the Petition Date, the Kangs sought to market and sell Maplewood without seeking Court approval or Court oversight.  Moreover, they sought to sell Maplewood without proceeding to pay any of the proceeds to MS Grand, to which Maplewood owed more than $600,000.  Instead, they planned to use a portion of the sale proceeds to pay their obligations to their non-debtor affiliate Grand Advertising, Inc., which totaled $91,000.

     d.   Due to the intervention of the Unsecured Creditors Committee, a portion of the proceeds was paid to MS Grand and none of the proceeds were paid to Grand Advertising, Inc.

64.    YJJ contends he did not know about the existence of the G-Mart entities until he was asked to sign its first store lease.  Nevertheless, thereafter, he acquiesced in and facilitated Mr. Kang's scheme to defraud Plaintiff by signing the lease and taking any other actions asked of him by Mr. Kang to facilitate the operations of the G-Mart companies.  Mr. Kang wanted to keep his interests in G-Mart secret due to the Bankruptcy Case and Steve Kim and YJJ assisted Mr. Kang with achieving this objective.

65.    YJJ attended a meeting with Mrs. Kang at a G-Mart accounting office on Braddock Road in Northern Virginia where she asked him to sign a lease for G-Mart Fairfax.  At that meeting, YJJ indicated he wanted to get out of this business as he was concerned it was not doing well financially.  He was especially concerned because Mr. Kang had him sign multiple personal guarantees of leases.  Mrs. Kang, however, begged YJJ to sign one more lease, so YJJ again acquiesced, feeling pressured and dependent on the Kangs for his income.  The Kangs told YJJ that they would take care of the debts if anything happened, but these were fraudulent statements at the time they were made because the Kangs were in bankruptcy and had no ability to assume the debts and obligations YJJ personally guaranteed.

66.    In August 2012, Mr. Kang asked G-Mart employee Justin Kong to travel to Atlanta to set up a new G-Mart store.  In December 2013, Mr. Kang asked Mr. Kong to be the manager of a new G-Mart store in Baltimore.

67.    Mr. Kang has fraudulently represented to Plaintiff that he provided advice and "consulting" services to Five Days and various G-Mart stores without any compensation.

68.     In reality, Mr. Kang received unreported cash payments from the operations of many of the Five Days and G-Mart businesses.

69.     For example, for at least two years, Mr. Kang had a practice of traveling to Atlanta on a regular basis to obtain cash payments from the store.  Still photos taken from a video surveillance camera at the Atlanta G-Mart store confirm Mr. Kang personally received cash payments on at least three occasions.  Ricky Cho, or another G-Mart employee, removed cash from the safe, counted it in view of the camera and provided the cash directly to Mr. Kang, usually approximately $2,000.

70.     Ricky Cho is a former employee of MS Grand who managed and operated the Atlanta G-Mart store and also worked for Five Days.

71.     Mr. Kang admitted to Plaintiff in a March 12, 2015 interview to receiving at least $7,000 - $8,000 in cash from Ricky Cho in August or September 2014.

72.     On one occasion, Mr. Kang's business associate Han Cho observed Mr. Kang take $25,000 from G-Mart's Atlanta store.  Mr. Cho personally gave Mr. Kang cash payments from G-Mart of at least $6,000.  Mr. Cho also gave Mr. Kang $5,000 cash from personal funds.

73.     Young Nam Kang helped support Mr. Kang's receipt of income from G-Mart Atlanta by going to Atlanta before the store opened and helping to prepare it for the grand opening.

74.     During summer 2014, Mr. Kang received $1,000 in cash from YJJ from G-Mart's Frederick, Maryland store.

75.     Justin Kong also gave Mr. Kang $300 from G-Mart's Baltimore store.

76.     Steve Kim opened and controlled all the bank accounts for Five Days and the G-Mart stores.  Steve Kim and YJJ were authorized signatories on all of these accounts.  Steve Kim

also had several stamps of YJJ's signature created and therefore was able to execute checks from these accounts using YJJ's signature. Steve Kim also used the YJJ signature stamp to execute documents on behalf of YJJ, sometimes without YJJ's knowledge or consent.

77.    Mrs. Kang knew Mr. Kang was receiving cash payments from revenue generated by the various G-Mart companies, used those funds for personal expenses and agreed with Mr. Kang to conceal their receipt and use of funds generated by the G-Mart companies from Plaintiff.

78.    Between 2012 and 2014, Sue Kang Kim provided advice to Five Days and the G-Mart Stores via communications with Steve Kim, including advice regarding lease agreements, vendor disputes and customer relations.

79.    Sue Kang Kim knew her husband was causing and facilitating parents' receipt of funds generated by the G-Mart companies and concealment of those funds from Plaintiff and the Bankruptcy Court, and she agreed to participate in the scheme and perpetuate the concealment of her parents' involvement in the G-Mart companies and receipt of unreported revenue from Plaintiff and the Bankruptcy Court.

80.    Upon information and belief, the Kangs received many other undocumented cash payments from Five Days and the G-Mart companies.

81.    The Kangs failed to disclose any of the income they derived from the Five Days and G-Mart enterprise to Plaintiff.

82.    The income the Kangs derived from the Five Days and G-Mart enterprise is property of the Kangs' Estates.

83.    The Kangs' Estates were harmed in an amount of no less than $45,300 on account of the Kangs' failure to disclose and turnover cash payments they received from the Five Days and G-Mart enterprise.

20

**Just Dairy**

84.     In 2012, Mr. Kang asked Justin Kong to open a dairy wholesale business called Just Dairy, which Mr. Kong agreed to do.  Just Dairy operated out of the Warehouse.

85.     Mr. Kong opened a bank account for Just Dairy and gave Mr. Kang a debit card associated with the account.  The Kangs used funds from Just Dairy's bank account for personal expenses, such as food and gas purchases.

86.     The Kangs failed to disclose to Plaintiff or the Bankruptcy Court any of the income they derived from their use of the Just Dairy debit card.

87.     The income the Kangs derived from their use of the Just Dairy debit card is property of the Kangs' Estates.

88.     The Kangs' Estates were harmed on account of the Kangs' failure to disclose and turnover the proceeds of their use of the Just Dairy debit card.

**Steve Kim's Companies**

89.     At Mr. Kang's encouragement, Steve Kim formed and/or operated a number of companies, including R&C International, Fiesta Wholesale, U.S. Onion, and Bravo Foods (collectively, "Steve Kim's Companies").  These entities, along with the aforementioned Just Dairy, also supplied G-Mart stores with food products and provided more potential sources of illicit revenue for the Kangs.  The Steve Kim Companies became another source of revenue for Steve and Sue Kim which existed only because of Mr. Kang's creation of the G-Mart companies which were the primary customers of the Steve Kim Companies.

90.     Steve Kim established a bank account for R&C International and gave the debit card for the account to the Kangs.

91.     The Kangs used the R&C International bank account debit card for personal purchases.

92.     The Kangs failed to disclose to Plaintiff any of the income they derived from R&C International.

93.     Steve Kim and/or Ricky Cho created R&C International and Steve Kim gave the Kangs the R&C International debit card with the intent to facilitate the Kangs' receipt of money without disclosing the income to Plaintiff.

94.     Like with Five Days and the G-Mart Stores, Sue Kang Kim provided advice to Steve Kim related to Steve Kim's Companies' business matters.

95.     Sue Kang Kim knew her husband was causing and facilitating her parents' receipt of money through Steve Kim's Companies, and concealment of income from Plaintiff and the Bankruptcy Court, and she agreed to participate in the scheme.

96.     The income the Kangs derived from their use of the R&C International debit card and Steve Kim's Companies is property of the Kangs' Estates.

97.     The Kangs' Estates were harmed on account of the Kangs' failure to disclose and turnover the proceeds of their use of the R&C International debit card.

**David's International Foods LLC**

98.     Yong Soo So ("YSS"), one of Mr. Kang's cousins, formed David's International Foods LLC, a food wholesale business, at the request and direction of Mr. Kang.  YSS was the nominal owner, but Mr. Kang actually owned and controlled it.

99.     Mr. Kang directed YSS to open a bank account for David's International Foods LLC at Bank of America.  The account was in YSS's name, but the bank statements were mailed

to Mr. Kang's former MS Grand business address.  Steve Kim managed this bank account at the request of Mr. Kang.

100.    Upon information and belief, Steve Kim facilitated the transfer of David's International Foods LLC's funds to the Kangs and did so with the intent to facilitate the Kangs' receipt of money without disclosing the income to Plaintiff or the Bankruptcy Court.

101.    Sue Kang Kim knew her husband was causing and facilitating her parents' receipt of money from David's International Foods LLC and concealment of those funds from Plaintiff and the Bankruptcy Court, and she agreed to participate in the scheme.

102.    The income the Kangs derived from David's International Foods LLC is property of the Kangs' Estates.

103.    The Kangs' Estates were harmed on account of the Kangs' failure to disclose and turnover funds they received from David's International Foods LLC.

### SoMi General Contractor, Inc.

104.    SoMi General Contractor, Inc. ("SoMi") was another company conceived of and controlled by Mr. Kang.

105.    Upon information and belief, SoMi was nominally owned by YSS.  G-Mart was SoMi's only client and did construction work on the G-Mart stores.

106.    Upon information and belief, SoMi provided G-Mart and its landlords with fraudulent work orders that inflated the costs associated with construction and equipment purchases financed by landlord construction allowances.  G-Mart then used the excess tenant allowance money to finance the opening of other G-Mart stores or other expenses of the G-Mart enterprise.

107.    Steve Kim controlled SoMi's bank accounts and gave the Kangs a debit card linked to SoMi's SunTrust Bank account.

108.    In connection with the Criminal Case, the FBI seized this debit card from the Kangs' home.

109.    Upon information and belief, before it was seized, the Kangs used this debit card for personal expenses.

110.    Mr. Kang also directed Steve Kim to disburse funds from SoMi's bank account to his daughter Young Nam Kang, although she did not work for SoMi.  Upon information and belief, Steve Kim did as Mr. Kang asked with the intent to facilitate the Kangs' receipt of money without disclosing the income to Plaintiff.

111.    Sue Kang Kim knew her husband was causing and facilitating her parents' receipt of money from SoMi and concealment of those funds from Plaintiff and the Bankruptcy Court, and she agreed to participate in the scheme.

112.    The Kangs failed to disclose to Plaintiff or the Bankruptcy Court any of the income they derived from SoMi.

113.    The income the Kangs derived from their use of the SoMi debit card is property of the Kangs' Estates.

114.    The Kangs' Estates were harmed on account of the Kangs' failure to disclose and turnover the proceeds of their use of the SoMi debit card.

### Grand Advertising, Inc.

115.    Grand Advertising, Inc. is an affiliate of the Kangs which provided advertising services to Kang-related entities and which operated from the Kangs' residence at 9378 Colbert Court in Fairfax, Virginia.

116.    Grand Advertising, Inc. provided advertising and marketing services for a number of the G-Mart related companies discussed above.

117.    Grand Advertising, Inc. employed Sue Kang Kim as a contracts manager and Sue Kang Kim also served as one of the company's officers.

118.    Sue Kang Kim provided services with knowledge that the G-Mart companies were formed and operated for the purpose of creating revenue for her parents in a way that would conceal their income from Plaintiff and the Bankruptcy Court.  Sue Kang Kim provided these services to help the G-Mart companies generate revenue for her parents without that income being disclosed to Plaintiff.

**Diversion of Funds From Grand Centreville Transaction**

119.    The Kangs' most valuable assets consisted of their indirect ownership interests in Grand Centreville, LLC, which owned a shopping center known as "Grand Centreville" in Centreville, Virginia.  In March 2009, Yeon Kyung Han ("Mrs. Han") and James Y. Sohn ("Mr. Sohn") purported to acquire a portion of the Kangs' indirect interests in Grand Centreville, LLC. The purported acquisition was the subject of a lawsuit filed in the Bankruptcy Court.  Mrs. Han and Mr. Sohn have been convicted and sentenced by the District Court for their wrongful actions committed in connection with the Grand Centreville property.  Mr. Kang was complicit with Mrs. Han and Mr. Sohn in this wrongdoing.

120.    The estate professionals who were investigating the Grand Centreville transaction sought discovery from Mrs. Han and others pursuant to orders of the Bankruptcy Court.  Mrs. Han, Mr. Sohn and other individuals produced four separate (and different) settlement statements from the closing of the transaction.  On February 23, 2012, Mrs. Han testified under oath at her deposition, identifying the "correct" settlement statement from among the four versions.  This

supposedly correct closing statement indicated that no cash was paid to the Kangs by Mrs. Han or Mr. Sohn.

121.    However, in a subsequent deposition conducted on November 18, 2013, in a lawsuit filed in connection with the MS Grand Bankruptcy Case, Mrs. Han conceded that she knowingly lied in her first deposition.  During the second deposition, Mrs. Han identified the correct settlement statement, one indicating that Mr. Sohn actually paid, as part of the purchase price, approximately $1.9 million, which he delivered to Mrs. Han (and her company, Pacific Realty) for the payment of unidentified third parties, allegedly at Mr. Kang's direction.  She testified that $1 million was paid by wire and that Mr. Sohn delivered the remaining $900,000 in brown paper bags of cash (in $100 bills).  Mrs. Han acknowledged that her prior testimony was no mere mistake but, rather, an intentional lie.

122.    Mrs. Han testified at the November 2013 deposition that the incorrect settlement statement, which she falsely identified as correct at her prior deposition, was, in fact, specifically created for her first deposition (which took place nearly three years after the closing of the sale at issue).  She testified that she, Mr. Sohn, Mr. Kang and an attorney, Seung (Sandy) Oh, conspired to create the false exhibit in order to hide the $1.9 million payment by Mr. Sohn from Plaintiff.

123.    According to Mrs. Han, Mr. Kang participated in the forgery and conspiracy because he did not want the professionals representing the Bankruptcy Estates to learn that money was paid to his friends, who might then be sued for fraudulent conveyances or preferential transfers.  Thus, the net result of these actions was to hide these potential assets from Plaintiff and frustrate the bankruptcy process to the detriment of legitimate creditors of the estate.

124.     During subsequent interviews conducted pursuant to the cooperation requirements in his plea agreement, Mr. Kang denied having any role in, or knowledge of, the fabrication or delivery of false closing statements regarding Grand Centreville.

125.     On April 15, 2015, special counsel for the Plaintiff took the deposition of Kunsoo "Kevin" Han ("Mr. Han").  Mr. Han is the husband of Mrs. Han, and the principal broker at Pacific Realty, Inc.  During the April 15, 2015 deposition, Mr. Han testified that Mr. Kang and Mr. Sohn routinely delivered and received cash (often in brown paper bags) to and from Mrs. Han.  The cash was maintained in the safe located at Pacific Realty's office in Annandale, Virginia.  The cash transfers were not reported to anyone.  Mr. Kang's reliance on Mrs. Han to hold cash suggests an ongoing motivation on Mr. Kang's part to keep the receipt of funds a secret.

126.     Eventually, the Plaintiff obtained information from Mrs. Han regarding the disposition of the $1.9 million.  It turns out that substantial payments were made to Mr. Kang's relatives.  For example, $200,000 was paid to Young Mi Kang, Mr. Kang's sister-in-law.  Upon information and belief, payments were also made to the Kangs' children.

127.     Despite his categorical denial of any role in the fabrication of falsified closing statements, it appears that Mr. Kang was, in fact, involved in the scheme.  Further, it appears that Mr. Kang continued to lie to the Plaintiff regarding the matter in order to protect his family members from possible liability.  Mr. Kang's participation in an effort to defraud the bankruptcy professionals regarding his receipt or dominion over $1,900,000 has damaged the Bankruptcy Estates.

**Spa World Rental Income**

128.    Following the sale of Grand Centreville, one of the tenants at the shopping center, Spa World, became seriously in arrears in the payment of rent, in the approximate amount of $654,000.

129.    Mrs. Han, Mr. Sohn and Mr. Kang agreed to collect the rent directly from Spa World rather than letting the property manager for Grand Centreville collect the rent and deposit it into Grand Centreville's bank account (as was customary).

130.    In 2011, Spa World paid Mrs. Han and Mr. Sohn their 60% of the arrearage (*i.e.,* $392,439) in cash.

131.    In 2011, Mr. Kang accepted "his" 40% share of Spa World's rent arrearages in the form of Spa World tickets with a face value of approximately $261,000.

132.    Mr. Kang accepted the tickets, rather than cash, to avoid reporting or turning the funds over to the examiner and to obstruct the examiner from tracing the proceeds of the Spa World tickets.

133.    Mr. Kang failed to disclose his receipt of $261,000 in Spa World tickets on his MORs.

134.    The Kangs' Estates were harmed in an amount of no less than $261,000 on account of Mr. Kang's actions to defraud the examiner and take the Spa World tickets for himself.

**Mr. Kang's Criminal Plea and Sentencing**

135.    On July 17, 2013, an agent with the FBI served Mr. Kang with a letter informing him that he was a target of a criminal investigation for bankruptcy fraud.

136.    The Kangs continued to participate in various bankruptcy fraud schemes even after Mr. Kang was specifically advised by the U.S. Attorney of facts developed by the FBI illustrating a pattern of bankruptcy fraud.  Upon information and belief, the FBI continued to investigate the Kangs for the remainder of 2013 and throughout 2014.

137.    In November 2014, the FBI executed a Search and Seizure Warrant at the Kangs' residence during which the agents seized cash and coin assets with a value of no less than $30,001.40, a $42,300 Hermes handbag purchased by Sue Kang Kim, nine other luxury handbags, and other personal property of an unknown value (collectively, the "Seized Property").  The Seized Property constitutes property of the Kangs' Estates.

138.    On January 26, 2015, the United States Attorney commenced the Criminal Case, filing charges under 18 U.S.C. §§ 1519 & 2 for falsification of records in Mr. Kang's bankruptcy proceeding and aiding and abetting by failing to report the post-petition receipt of cash from grocery store employees.

139.    On February 4, 2015, Mr. Kang appeared at the District Court and pled guilty to a single count criminal information charging him with falsification of records in a federal bankruptcy case, in violation of Title 18, United States Code, Section 1519.

140.    On September 11, 2015, the District Court sentenced Mr. Kang to 11 months and 20 days in prison and ordered restitution payments in connection with his guilty plea, but did not address the Seized Property or its status.

141.    The Seized Property remains in the custody of the FBI.

## Monument Bank Stock

142.    In or about 2005, Mr. Kang purchased 12,500 shares of stock in Monument Bank, n/k/a Revere Bank.

143.    In or about September 2016, Monument Bank informed Plaintiff of Mr. Kang's stock interest, which the Bank valued at $15.00 per share.  These shares were not disclosed on Mr. Kang's bankruptcy schedules, and the Kangs did not disclose the ownership of the stock to Plaintiff or the Bankruptcy Court.

144.    On September 8, 2016, Plaintiff's counsel wrote counsel for the Kangs to inquire about the unreported stock interest.  Initially, counsel for the Kangs replied that "Mrs. Kang says that the FBI took the certificates" of shares.  Hours later, counsel for the Kangs advised counsel for Plaintiff that his clients were in possession of the certificates, which have since been turned over to Plaintiff.

145.    Upon information and belief, the Kangs knowingly concealed the existence of their interest in this stock from Plaintiff and the Bankruptcy Court.

**The Kangs' Fraudulent Misrepresentations to the Bankruptcy Court and Plaintiff**

146.    On February 4, 2015, the United States of America and Mr. Kang stipulated that the allegations in the Criminal Information (Criminal Case, Docket No. 4) and contained in the Statement of Facts ("SOF") (Criminal Case, Docket No. 7) are true and correct.

147.    The Kangs are required by the United States Bankruptcy Code (the "Bankruptcy Code") to submit financial information to Plaintiff as part of their bankruptcy in order for the Plaintiff to file MORs.  Prior to Plaintiff's appointment as Chapter 11 trustee, the Kangs, through counsel, filed MORs on a monthly basis.  Following his appointment, Plaintiff filed the Kangs' MORs with the Court with information provided by the Kangs.  The Bankruptcy Code requires the Kangs to be truthful in their reporting of their personal financial information to Plaintiff and their reportings were submitted under oath.  Any money the Kangs earn or receive must be disclosed and described in the MORs.  The Kangs' MORs detail their finances (*i.e.*, cash receipts

and cash disbursements) for a given month.  The MORs also include information related to the Kangs' reported monthly wages, bank account balances, cash gifts received, and money borrowed.  (*See* SOF ¶ 6.)

148.    In or about October 2014, in the Eastern District of Virginia, Mr. Kang knowingly falsified a Monthly Operating Report, a document, with the intent to impede, obstruct, and influence the investigation and proper administration of his Chapter 11 bankruptcy case, a matter that Mr. Kang knew was within the jurisdiction of the Court, in violation of Title 18, United States Code, Section 1519.  (*See* SOF ¶ 7.)

149.    Consistent with their obligations under their bankruptcy case, the Kangs submitted to Plaintiff information to include in the MOR for the period ending September 30, 2014.  That report indicated total cash receipts of $2,352, which the Kangs stated were gifts from three family members.  In reality, the Kangs received cash payments during that time period which they did not report on the September 2014 MOR or any previous or subsequent MOR submitted in 2014.  For example, in August and September 2014, Mr. Kang obtained several thousand dollars in cash from grocery store employees on multiple occasions.  None of the cash payments Mr. Kang received were reported on the MORs they submitted to Plaintiff for the relevant reporting period.  Further, the Kangs have not disclosed any financial or management interest in any grocery store, including the stores from which they received cash payments.  (*See* SOF ¶ 8.)

150.    Mr. Kang's actions in furtherance of the offenses charged in the Criminal Case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law.  Indeed, by failing to report cash payments on his MOR, Mr. Kang intended to impede and obstruct the investigation of his Chapter 11 bankruptcy case.  (*See* SOF ¶ 9.)

151.   Upon information and belief, the Kangs have received additional monetary and other financial benefits after the Petition Date that were not identified in the Criminal Case SOF and not disclosed by the Kangs' MORs, including the following payments:

- Mr. Kang's mother:  $5,000 to $6,000 around March 2014

- Mr. Yong Jin Jung:  $1,000 around June 2014 and he allowed Mr. Kang to use his personal credit card

- Ricky Cho:  $7,000 to $8,000 on or around August to September 2014

- Han Cho:  $5,000 – Mr. Kang contends he does not recall when these funds were provided

152.   The cash payments and financial benefits the Kangs received after the Petition Date, and the Seized Property, constitute property of the Kangs' Estates.  The Kangs' Estates and their creditors were harmed in at least the following amounts by the Kangs' failure to deliver the payments to Plaintiff:   $45,300 (G-Mart cash payments); $471,169 (Korean Properties); $261,000 (Spa World tickets); $30,001.40 (Seized Property); and $18,000 (unreported payments).

## COUNT I
**(Civil RICO Pursuant to 18 U.S.C. § 1962(b) & (c) against the Kangs, Bob Sik Kang, YJJ, Steve Kim, Sue Kang Kim and Young Nam Kang regarding the Korean Properties and G-Mart Companies)**

153.   Plaintiff incorporates by reference, as if fully restated herein, the allegations set forth in the preceding paragraphs of the Complaint.

154.   At all times material hereto, Bob Sik Kang, YJJ, Steve Kim, Sue Kang Kim and Young Nam Kim knew the Kangs had filed for bankruptcy and that their assets were under the jurisdiction and supervision of the Bankruptcy Court.  These Defendants also knew and understood

that the Kangs were obligated by the Bankruptcy Code to truthfully and accurately disclose all of their bank accounts, properties, income, assets and money to Plaintiff and the Bankruptcy Court.

## Korean Properties

155.    The Kangs owned, operated and managed an enterprise of revenue generating properties located in Korea, and Bob Sik Kang associated in fact with the Kangs for the common purpose of operating and managing properties owned by Mr. Kang.  The enterprise was engaged in international commerce.  The Kangs and Bob Sik Kang participated in this association in fact with the illegal purpose of concealing revenue generated from these properties from Plaintiff and the Bankruptcy Court.

156.    The Kangs and Bob Sik Kang agreed to participate in the Korean Properties enterprise in the ways described above and agreed to perform the predicate acts forming the pattern of racketeering activity, and therefore are subject to liability under 18 U.S.C. § 1962(c). Mr. and Mrs. Kang are additionally subject to liability under 18 U.S.C. § 1962(b) because they control the enterprise and are owners of the Korean Properties.

157.    The Korean Properties enterprise is characterized by continuity, unity, the shared purpose of operating a series of commercial properties and farm and forest land, and has an identifiable structure.

158.    The Kangs and Bob Sik Kang know and understand that the enterprise exists for the purpose of engaging in a pattern of racketeering activity as defined by 18 U.S.C. § 1961.  The enterprise engaged in a pattern of racketeering activity as defined by 18 U.S.C. § 1961, which activity existed separate and apart from the enterprise's lawful purpose of operating commercial and agricultural properties.

159.    Pursuant to 18 U.S.C. § 1961(1)(A), the pattern of racketeering activity included multiple violations of at least the following:  18 U.S.C. § 1952(a) (Racketeering), 18 U.S.C. § 1956 (Money Laundering), and 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity).

160.    Pursuant to 18 U.S.C. § 1961(1)(D), this pattern of racketeering activity included the following offenses involving fraud connected with a case under Title 11:  (a) multiple acts of fraudulent concealment and misrepresentation in MORs submitted to Plaintiff and the Court, month after month; (b) multiple incidences of the Kangs failing to disclose the existence of their Gwangju Accounts; (c) multiple incidences of the Kangs receiving unreported deposits of proceeds from their Korean properties in their foreign bank accounts; (d) multiple incidences of the Kangs making false oaths to Plaintiff and the Bankruptcy Court; and (e) multiple violations of 18 U.S.C. § 1519 (Destruction, Alteration or Falsification of Documents).

161.    Plaintiff and the Bankruptcy Estates have been injured by reason of the Korean Property enterprise engaging in patterns of racketeering activity in an amount no less than $471,169.

**The G-Mart Enterprise**

162.    The Kangs conceived of, orchestrated, controlled, operated and managed and participated in an enterprise engaged in interstate commerce which was comprised of multiple corporations, LLC's, associations, legally established entities, and individuals associated in fact for the common purpose of engaging in a retail grocery store business and concealing from Plaintiff and the Bankruptcy Court revenue generated by those companies for the Kangs.

163.    The businesses and associations that comprise this enterprise include, without limitation: Five Days, Five Days Wholesale, Inc., G-Mart Alexandria, Inc., G-Mart Baltimore,

Inc., G-Mart Clinton, Inc., G-Mart Fairfax, Inc., G-Mart Frederick, Inc., G-Mart Hillcrest

Heights, Inc., G-Mart Holdings, LLC, G-Mart International, G-Mart Kissimmee, Inc., G-Mart

Montgomery, Inc., G-Mart Virginia Beach, Inc., Fiesta International Market 2, Inc. t/a G-Mart

International Foods, Just Dairy, R&C International, Bravo Foods, U.S. Onion, Fiesta Wholesale,

David's International Foods LLC, SoMi General Contractor, Inc. and Grand Advertising, Inc.

164.     The individuals who associated in fact and participated in directing the affairs of

the enterprise included Mr. Kang, Mrs. Kang Bob Sik Kang, YJJ, Steve Kim, Young Nam Kang

and Sue Kang Kim.   These persons agreed to participate in the enterprise in the ways described

above and agreed to perform the predicate acts forming the pattern of racketeering activity, and

therefore are subject to liability under 18 U.S.C. § 1962(c).

165.     The G-Mart enterprise was characterized by continuity, unity, the shared purpose

of operating a chain of international grocery stores, and had an identifiable structure.  Five Days

was the primary food warehouser and distributor for the G-Mart entities.   The G-Mart entities

were separately incorporated by the location of each store.  Just Dairy, R&C International, and

David's International Foods LLC were separately formed entities that supplied the G-Mart

stores.  SoMi was separately incorporated to perform all construction and build-out services for

the G-Mart stores.  Grand Advertising, Inc. provided marketing and advertising services for G-

Mart companies.  The operation of this enterprise occurred continuously over approximately five

years such that the ongoing predicate acts of business of the enterprise posed a continuing threat

of future criminal activity.

166.     The Kangs, YJJ and Steve Kim owned interests in, and/or were involved in the

ownership, management, operations and control of various businesses within the enterprise and

knew and understood that the enterprise existed for the purpose of engaging in a pattern of

racketeering activity as defined by 18 U.S.C. § 1961, and therefore are subject to liability under 18 U.S.C. § 1962(b).

167.    The enterprise engaged in a pattern of racketeering activity as defined by 18 U.S.C. § 1961, which activity existed separate and apart from the enterprise's lawful purpose of selling food products to consumers.

168.    Pursuant to 18 U.S.C. § 1961(1)(A), the pattern of racketeering activity included multiple violations of at least the following:   18 U.S.C. § 1952(a) (Racketeering), 18 U.S.C. § 1956 (Money Laundering), 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344 (Financial Institution Fraud).

169.    Pursuant to 18 U.S.C. § 1961(1)(D), this pattern of racketeering activity included the following offenses involving fraud connected with a case under Title 11:  (a) multiple acts of fraudulent concealment and misrepresentation in MORs submitted to Plaintiff and the Court, month after month; (b) multiple incidences of the Kangs receiving unreported cash payments from Steve Kim, YJJ, Han Cho,  Ricky Cho and other employees of the companies who siphoned money from the businesses participating in the enterprise; (c) the Kangs' multiple uses of debit cards from businesses participating in the enterprise for personal use; (d) Young Nam Kang's receipt of multiple payments from the enterprise without providing services to conceal revenue generated for the Kangs; (e) multiple incidences of the Kangs making false oaths to Plaintiff and the Bankruptcy Court; and (f) multiple violations of 18 U.S.C. § 1519 (Destruction, Alteration or Falsification of Documents).

170.    The Bankruptcy Estates have been injured by reason of the G-Mart enterprise engaging in patterns of racketeering activity in an amount no less than $63,300.

## COUNT II
**(Business Conspiracy Va. Code 18.2-500 against the Kangs, Bob Sik Kang, YJJ, Steve Kim, Young Nam Kang, and Sue Kang Kim)**

171.     Plaintiff incorporates by reference, as if fully restated herein, the allegations set forth in the preceding paragraphs of the Complaint.

172.     The Kangs combined, associated, agreed, and mutually undertook concerted actions together with the following persons in the following ways to injure the Creditors in their trade, business or profession:

a.     With Bob Sik Kang for the unlawful purpose of fraudulently concealing from Plaintiff and the Bankruptcy Court revenue generated from the Korean Properties and the Gwangju Accounts;

b.     With Steve Kim, Sue Kang Kim, YJJ and Young Nam Kang for the unlawful purpose of fraudulently concealing from Plaintiff and the Bankruptcy Court revenue generated by the G-Mart companies;

c.     With each other for the unlawful purpose of fraudulently concealing from Plaintiff and the Bankruptcy Court their collection of $261,000 worth of Spa World tickets in lieu of back rent owed by Spa World;

d.     With each other for the unlawful purpose of concealing from Plaintiff and the Bankruptcy Court their stock in Monument Bank; and

e.     With each other for the unlawful purpose of fraudulently concealing from Plaintiff and the Bankruptcy Court the Seized Property in their home.

173.     Defendants acted intentionally and without lawful justification.

174.     Defendants acted with legal malice and intent to injure the Creditors as evidenced by the elaborate lengths they went to, and the number of people the Kangs enlisted, to generate income that they fraudulently concealed from Plaintiff, the Bankruptcy Court, and the Creditors.

175.     The Bankruptcy Estates have been injured by reason of Defendants' conspiracy in an amount no less than $800,000.

## COUNT III
### (Common Law Conspiracy against the Kangs, Bob Sik Kang, YJJ, Steve Kim, Young Nam Kang, and Sue Kang Kim)

176.    Plaintiff incorporates by reference, as if fully restated herein, the allegations set forth in the preceding paragraphs of the Complaint.

177.    The Kangs combined, associated, agreed, and mutually undertook concerted actions together with the following persons in the following ways to injure the Creditors in their trade, business or profession:

    a.    With Bob Sik Kang for the unlawful purpose of fraudulently concealing from Plaintiff and the Bankruptcy Court revenue generated from the Korean Properties and the Gwangju Accounts;

    b.    With Steve Kim, Sue Kang Kim, YJJ and Young Nam Kang for the unlawful purpose of fraudulently concealing from Plaintiff and the Bankruptcy Court revenue generated by the G-Mart companies;

    c.    With each other for the unlawful purpose of fraudulently concealing from Plaintiff and the Bankruptcy Court their collection of $261,000 worth of Spa World tickets in lieu of back rent owed by Spa World;

    d.    With each other for the unlawful purpose of concealing from Plaintiff and the Bankruptcy Court their stock in Monument Bank; and

    e.    With each other for the unlawful purpose of fraudulently concealing from Plaintiff and the Bankruptcy Court the Seized Property in their home.

178.    Defendants acted intentionally and without lawful justification.

179.    Defendants acted with legal malice and intent to injure the Creditors as evidenced by the elaborate lengths they went to, and the number of people the Kangs enlisted, to generate income that they fraudulently concealed from Plaintiff, and the Bankruptcy Court, and their Creditors.

180.    The Bankruptcy Estates have been injured by reason of Defendants' participation in this conspiracy in an amount no less than $800,000.

## COUNT IV
### (Common Law Fraud – Against the Kangs)

181.    Plaintiff incorporates by reference, as if fully restated herein, the allegations set forth in the preceding paragraphs of the Complaint.

182.    The Kangs made false representations of fact to Plaintiff and the Bankruptcy Court and fraudulently concealed material information they had a duty to disclose to Plaintiff and the Bankruptcy Court on their MORs, in at least the following ways:

a.    Intentionally concealing from Plaintiff and the Bankruptcy Court revenue they received from the Korean Properties and the Gwangju Accounts;

b.    Intentionally concealing from Plaintiff and the Bankruptcy Court revenue they received from the G-Mart companies and other related companies;

c.    Intentionally concealing from Plaintiff and the Bankruptcy Court Mr. Kang's receipt of $261,000 worth of Spa World tickets in lieu of back rent owed by Spa World;

d.    Intentionally concealing from Plaintiff and the Bankruptcy Court the Kangs' interest in Monument Bank Stock; and

e.    Intentionally concealing from Plaintiff and the Bankruptcy Court the Seized Property hidden in their home.

183.    Plaintiff relied on the Kangs' fraudulent misrepresentations in his administration of the Estate.   Plaintiff's reliance on the Kang's fraudulent MOR's was reasonable because the Bankruptcy Code requires the Kangs to be truthful in their reporting of their personal financial information to Plaintiff and the Bankruptcy Court.

184.    The Bankruptcy Estates have been injured by reason of Defendants' fraudulent misrepresentations in an amount no less than $800,000.

## COUNT V
### (Declaratory Relief Pursuant to Bankruptcy Code Sections 105, 541 and 1115
### Against the Kangs)

185.    Plaintiff incorporates by reference, as if fully restated herein, the allegations set forth in the preceding paragraphs of the Complaint.

186.    Bankruptcy Code Section 105 permits this Court to enter any order to carry out the provisions of the Bankruptcy Code.  *See* 11 U.S.C. §105(a).

187.    Section 541(a) of the Bankruptcy Code provides that property of the Kangs' Estates consists of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).

188.    Section 1115(a)(1) of the Bankruptcy Code supplements Section 541 and provides that in the Bankruptcy Case, in which the debtors are individuals, property of the Kangs' Estates also includes "all property of the kind specified in section 541 that the [Kangs acquired] after the commencement of the case but before the case is closed, dismissed, or converted."  11 U.S.C. § 1115(a)(1).

189.    To the extent the Seized Property was acquired pre-bankruptcy by the Kangs, those assets became property of the Kangs' Estates pursuant to Section 541(a) of the Bankruptcy Code.

190.    To the extent the Seized Property was acquired by the Kangs while the Bankruptcy Case was pending, those assets became property of the Kangs' Estates pursuant to Section 1115(a)(1) of the Bankruptcy Code.

191.    WHEREFORE, the Plaintiff respectfully requests that the Court enter an order (i) declaring that the Seized Property is property of the Kangs' Estates, subject to the claims of creditors in the Bankruptcy Case, (ii) ordering the Kangs to stipulate that the Seized Property

should be delivered directly to Plaintiff; and (iii) granting Plaintiff such other and further relief as is just and appropriate under the circumstances, including attorneys' fees and costs associated with Plaintiff's recovery of the Seized Property.

## COUNT VI
### (Turnover of Property of Kangs' Estates Pursuant to Bankruptcy Code Sections 105, 521 and 542)

192.    Plaintiff incorporates by reference, as if fully restated herein, the allegations set forth in the preceding paragraphs of the Complaint.

193.    Plaintiff requires use of the Seized Property to administer the Kangs' Estates for the benefit of the Kangs' creditors.

194.    Section 521(a)(4) of the Bankruptcy Code places an affirmative duty on the Kangs to surrender to the Plaintiff all property of the Kangs' Estates, including the Seized Property.  *See* 11 U.S.C. § 521(a)(4).

195.    Furthermore, Section 542(a) of the Bankruptcy Code requires a person in possession, custody or control of property of the Kangs' Estates to deliver to the Plaintiff such property or the value of such property.  *See* 11 U.S.C. § 542(a).

196.    Accordingly, the Kangs have an affirmative duty to turn over the Seized Property to Plaintiff for his administration of those assets for the benefit of the Kangs' creditors.

197.    Plaintiff therefore brings this action to enforce the Kangs' obligations under the Bankruptcy Code to turn over the Seized Property to the Plaintiff.

## COUNT VII
### (Denial of Discharge Pursuant to Bankruptcy Code Section 727(a))

198.    Plaintiff incorporates by reference, as if fully restated herein, the allegations set forth in the preceding paragraphs of the Complaint.

199.    Section 1141(d)(3) of the Bankruptcy Code provides that "[t]he confirmation of a plan does not discharge a debtor if . . . (A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title."  11 U.S.C. § 1141(d)(3).

200.    The Plan is a liquidating plan that provides for the liquidation of all or substantially all of the property of the Kangs' Estates.

201.    The Kangs will not continue their pre-petition grocery business as all of the Kangs' pre-petition business assets are being liquidated for the benefit of creditors.

202.    Section 727(a)(2) of the Bankruptcy Code provides that a debtor's discharge shall be denied if a debtor, with the intent to hinder, delay, or defraud a creditor or an officer of the estate, has transferred, removed, destroyed, mutilated, or concealed (A) property of a debtor's, within one year prior to the petition date or (B) property of a debtor's estate, after the petition date.  The Kangs have, with intent to hinder, delay and defraud creditors and the Plaintiff, transferred and concealed property of the Kangs' Estates both prior to and following the Petition Date.

203.    Section 727(a)(3) of the Bankruptcy Code provides that a debtor's discharge shall be denied if a debtor "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and paper, from which the debtor's financial condition or business transactions might be ascertained."  The Kangs have concealed and failed to maintain and to deliver to Plaintiff and the Bankruptcy Court documents regarding their financial condition and business transactions.

204.    Section 727(a)(4) of the Bankruptcy Code provides that a debtor's discharge shall be denied if a debtor knowingly and fraudulently, in or in connection with the bankruptcy case, (i) made a false oath or account or (ii) withheld from an officer of the estate any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.  The Kangs knowingly and fraudulently made false oaths and accounts and withheld from Plaintiff and the Bankruptcy Court recorded information relating to their property and financial affairs.

WHEREFORE, the Plaintiff respectfully requests that the Court:

(1)    Enter judgment denying the Kangs' a discharge in bankruptcy;

(2)    Enter judgment in favor of Raymond A. Yancey, Chapter 11 Trustee for the bankruptcy estates of Min Sik Kang and Man Sun Kang and against Min Sik Kang, Man Sun Kang, Bop Sik Kang, Steve Kim, Sue Kang Kim, Young Nam Kang, and Yong Jin Jung jointly and severally for damages in an amount to be proven at trial;

(3)    Enter an order for declaratory relief in favor of Raymond A. Yancey, Chapter 11 Trustee for the bankruptcy estates of Min Sik Kang and Man Sun Kang and against Min Sik Kang and Man Sun Kang declaring that the Seized Property constitutes property of the Kangs' Estates, subject to the claims of creditors in the Bankruptcy Case, ordering the Kangs to direct that the Seized Property be delivered directly to Plaintiff and authorizing the FBI to release the Seized Property to Plaintiff;

(4)    Enter an order compelling the Kangs to turnover the Seized Property to Plaintiff and authorizing the FBI to release the Seized Property to Plaintiff.

(5)    Enter a judgment in favor of Raymond A. Yancey, Chapter 11 Trustee for the bankruptcy estates of Min Sik Kang and Man Sun Kang for attorneys' fees incurred in this action;

(6)    Enter a judgment in favor of Raymond A. Yancey, Chapter 11 Trustee for the bankruptcy estates of Min Sik Kang and Man Sun Kang and against the Kangs granting the Plaintiff such other and further relief as is just and appropriate under the circumstances.

Dated:  August 29, 2017                    Respectfully submitted,


                                        /s/ Jeffrey L. Tarkenton
                                        Jeffrey L. Tarkenton (VSB No. 20631)
                                        Cathy A. Hinger (VSB No. 46293)
                                        Pascal F. Naples (VSB No. 87849)
                                        WOMBLE CARLYLE SANDRIDGE &
                                            RICE, LLP
                                        1200 Nineteenth Street, N.W.
                                        Suite 500
                                        Washington, DC  20036
                                        Telephone:  202-857-4450
                                        Facsimile:  202-261-0050
                                        jtarkenton@wcsr.com
                                        chinger@wcsr.com
                                        pnaples@wcsr.com

                                        *Counsel for Plaintiff Raymond A. Yancey*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 29th day of August, 2017, I caused a copy of the

foregoing **AMENDED COMPLAINT OBJECTING TO DISCHARGE AND FOR OTHER**

**RELIEF** to be served via CM/ECF, on the following:

> Barry Coburn, Esq.
> Coburn & Greenbaum PLLC
> 1710 Rhode Island Avenue, N.W.
> Washington, DC  20036
> E-mail:  barry@coburngreenbaum.com
>
> *Attorney for Defendants Sue Kang Kim,*
> *Young Nam Kang, Bop Sik Kang, and*
> *Steve Kim*
>
> James A. Vidmar, Esq.
> Yumkas, Vidmar, Sweeney & Mulrenin, LLC
> 10211 Wincopin Circle
> Suite 500
> Columbia, MD  21044
> E-mail:  jvidmar@yvslaw.com
>
> *Attorney for Defendants Min Sik Kang and*
> *Man Sun Kang*

and via electronic mail, on the following:

> Yong Jin Jung
> grandyong@gmail.com

> /s/ Jeffrey L. Tarkenton
> Jeffrey L. Tarkenton